IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

          Plaintiff/Respondent,

v.                                           No. CIV 04-230 BB/LFG
                                           No. CR 98-976 BB

RUBEN ALMARAZ,

          Defendant/Movant.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1.      On March 2, 2004, Movant Ruben Almaraz ("Almaraz") filed an application for writ

of habeas corpus under 28 U.S.C. § 2255. [Doc. No. 1.]  The § 2255 motion is fully and adequately

briefed; Almaraz, however, did not file a reply brief.[2]  [Doc. Nos. 1, 7.]  Almaraz requests an

evidentiary hearing on his claims that trial counsel was ineffective and asks that the Court vacate his

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2]Almaraz is represented by counsel on his § 2255 application for habeas relief.  Recently, on June 18, 2004, Almaraz filed a Motion for Evidentiary Hearing.  This Motion may be construed as a reply, albeit untimely, to the government's response.  Furthermore, Almaraz already had requested an evidentiary hearing as to his § 2255 habeas application.  The Court has carefully reviewed this recent motion and determines that no response is necessary.  The Motion is essentially an outline of the same positions already contained in the application, and as explained above the Court recommends that the § 2255 application be denied and further finds that no evidentiary hearing is necessary.

criminal convictions and order him released unless a new trial is held within a reasonable time.  [Doc. No. 1, p. 23.]  Almaraz is incarcerated at the Federal Correctional Institution at La Tuna, in Anthony New Mexico.  [Doc. No. 285.]

2.      In making its recommendation on this matter, the Court examined all of the pleadings and attachments in this civil matter and the related criminal case, and thoroughly reviewed the transcript of the criminal trial and sentencing before the Honorable C. LeRoy Hansen.  *See* No. CIV 04-230; No. CR 98-976; Trial Transcript Vols. 1-6 ("Trial Tr."); and Jan. 8, 2001 Sentencing Transcript.  After carefully considering the pleadings, attachments, argument by counsel and the pertinent law, the Court recommends that Almaraz's § 2255 petition be denied.  Because it is possible to resolve the issues on the pleadings, and the record establishes conclusively that Almaraz is not entitled to relief, the Court concludes that no evidentiary hearing is necessary.  *See* 28 U.S.C. § 2255; United States v.  Kennedy, 225 F.3d 1187, 1193 (10th Cir.2000), *cert. denied*, 532 U.S. 943 (2001).

## Background

3.      On June 16, 1999, a federal grand jury returned a second superseding, eleven-count indictment charging Almaraz and five co-defendants with: Engaging in a Continuing Criminal Enterprise (Count I); Conspiracy to Possess with Intent to Distribute More than 5 Kilograms of Cocaine (Count II); Possession with Intent to Distribute More than 500 Grams of Cocaine (Count X); and Possession with Intent to Distribute Less than 500 Grams of Cocaine (Counts III, IV, VI, VII, VIII, IX and XI).  [Doc. No. 115, 98cr976.]  Almaraz entered a plea of not guilty to the charges.

4.      On August 23, 1999, Almaraz went to trial with four co-defendants.  Almaraz was represented by trial counsel, Joseph (Sib) Abraham.  On August 30, 1999, the jury returned a guilty verdict against Almaraz as to Count I- Engaging in a Continuing Criminal Enterprise, in violation of

21 U.S.C. § 848; Counts VI and VII- Possession with Intent to Distribute Less than 500 grams of

Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and Count X, Possession with Intent

to Distribute More than 500 grams of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)

[Doc. No. 168, 98cr976.]

     5.      On January 8, 2001, the Court sentenced Almaraz to a period of incarceration of 240

months as to each of Counts I and X; and 240 months as to Counts VI and VII; said terms to run

concurrently.[3]  At the sentencing proceeding, Almaraz was represented by Peter Schoenburg.  On

January 30, 2001, Judgment was entered. [Doc. No. 285, 98cr976.]  On February 9, 2001, Almaraz

filed a timely notice of appeal, through his counsel Schoenberg.  Subsequently, Almaraz was found

indigent and eligible for appointment of appellate counsel under the Criminal Justice Act.  [Doc. No.

311, 98cr976.]  Schoenberg withdrew, and federal public defender Richard Winterbottom was

appointed to represent Almaraz on the appeal.  In Almaraz's appeal, he argued that the government

failed to present sufficient evidence to show that he organized, supervised, or managed five other

persons at any time.  He also argued that as a matter of law, even if there was sufficient evidence to

show he organized five people at some point, there was no evidence he organized five persons while

committing those three violations on which the jury convicted.  In other words, the question was

whether the jury was limited to considering only those offenses on which it returned a guilty verdict

in deciding whether the defendant organized five or more people, or whether it could consider

---

[3] "The federal 'drug king pin' statute forbids any 'person' from engaging in a continuing criminal enterprise.  A conviction on this statute carries a harsh penalty, requiring the trial court to impose a twenty-year mandatory minimum prison term.  A continuing criminal enterprise is defined as a violation of the drug statutes where 'such violation is a part of a continuing series of violations . . . undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management." United States v. Almaraz, 306 F.3d 1031, 1033 (10th Cir. 2002) (internal statutory cites omitted), *cert. denied*, 537 U. S. 1241 (2003).

evidence of other acts or violations of which the jury did not reach a guilty verdict in making the determination of whether Almaraz organized five or more people. After careful consideration of these questions, the Tenth Circuit affirmed Almaraz's conviction. <u>United States v. Almaraz</u>, 306 F.3d 1031 (10th Cir. 2002). His petition for writ of certiorari was denied on March 3, 2003. [Doc. No. 1, Ex. C.]

      6.     Almaraz's federal habeas petition asserts that he was denied effective assistance of counsel in violation of his Sixth Amendment rights in relation to trial counsel Abraham's representation of him. Almaraz asserts specifically that Abraham failed to investigate and present Almaraz's central defense that he was not the leader or organizer of a continuing criminal enterprise, but rather, a "struggling restaurant owner who foolishly succumbed to the temptation to engage in street-level drug sales with the help of a single associate." [Doc. No. 1, p. 5.] Almaraz also asserts that his attorney was constitutionally ineffective for failure to request a jury instruction on this central defense theory, to object to inadmissible expert testimony, to object to the prosecution's improper vouching for its witnesses, and to object to inadmissible hearsay. Almaraz further contends that he was denied a fair trial because of prosecutorial misconduct, in relation to some of the same grounds alleged in support of the ineffective assistance of counsel claims. [Doc. 1.]

      7.     The government responds that a review of the trial transcript reveals that Almaraz received effective assistance of counsel at trial and that the prosecution did not engage in misconduct. The government also argues that many of Almaraz's claims are procedurally barred either because he failed to raise them on direct appeal or they already were clearly decided on direct appeal. The government further asserts that Almaraz improperly characterizes his claims in terms of ineffective assistance of counsel in order to avoid the procedural bar.

## **Factual and Procedural Summary**

8.     The government's response to Almaraz's § 2255 application sets out in detail the

factual chronology of its undercover surveillance and controlled buys operation, but the Court does

not repeat that lengthy summary here.  [Doc. No. 7, pp. 3-17.]  However, the Court  does set forth

below the factual summary provided by the Tenth Circuit in its resolution of Almaraz's appeal.

> This case involves a drug organization that imported cocaine from Mexico for
> distribution in the Las Cruces, New Mexico, area.  At the heart of this organization
> were Ruben Almaraz and his younger brother, Carlos Almaraz. . . . The organization
> was comprised of family members and longtime close friends of the Almaraz family.
> The Almaraz brothers supplied large amounts of cocaine for sale by their street-level
> dealers.  A family restaurant, where both men worked, served as a cover for and a
> focal point of their drug distribution enterprise.
>
> Jesus Orozco, a friend of the Almaraz brothers, assisted in the cocaine distribution
> efforts.  Janette Orozco is his wife.  The parties dispute whether she was involved in
> the drug organization.  When things got too hot for Jesus Orozco because he became
> concerned law enforcement officials were watching him, he was replaced as a street-
> level dealer by two brothers, Carlos and Antonio Lopez.  Jesse Chavez arrived on the
> scene late in the game when Carlos Almaraz and Jesus Orozco gave a confidential
> informant a pager number.  Jesse Chavez manned that pager, returned phone calls,
> and sold cocaine for the organization.
>
> After several months of surveillance and controlled drug buys, law enforcement
> officials presented charges against Mr. Almaraz, Carlos Almaraz, Jesus Orozco,
> Janette Orozco, Carlos Lopez, Antonio Lopez, and Jesse Chavez to a grand jury.  The
> grand jury returned an indictment against Mr. Almaraz and these six co-defendants
> on numerous drug offenses.
>
> . . .
>
> Mr. Almaraz stood trial with four co-defendants: Carlos Almaraz, Jesus Orozco,
> Janette Orozco and Antonio Lopez.

Almaraz, 306 F.3d at 1033-34.

**Analysis**

I.    **PROCEDURAL BAR**

    *A.    Ineffective Assistance of Counsel Claims*:

9.    The government argues first that Almaraz's claims are procedurally barred.  It asserts that Almaraz failed to present the issues on direct appeal and cannot show cause for his procedural default, nor can he demonstrate actual prejudice resulting from the alleged error or that a fundamental miscarriage of justice will occur if his claim is not addressed.  United States v. Allen, 16 F.3d 377, 378-79 (10th Cir. 1994).  "[Section] 2255 is not available to test the legality of matters which should have been raised on appeal."  Id. at 378 (internal citation omitted).  The government recognizes that an ineffective assistance of counsel claim may serve as "cause" to excuse procedural default but argues that here, Almaraz merely couches his claims in terms of ineffective assistance of counsel in order to avoid the procedural bar.

10.    While an ineffective assistance of counsel claim may provide  "cause" to excuse procedural default of other underlying or "stand alone" claims, the defendant still must meet the "cause or prejudice" standard required to prove ineffective assistance of counsel.  *See also*  United States v. Cook, 45 F.3d 388, 392 (10th Cir.1995) (holding that petitioner may establish requisite cause and prejudice by demonstrating ineffective assistance of counsel, using the deficient performance and prejudicial effect analysis set forth in Strickland).  However, a defendant's substantive claim of ineffective assistance of counsel may be "and ordinarily should be" raised for the first time in a § 2255 proceeding.  United States v. Galloway, 56 F.3d 1239, 1241 (10th Cir. 1995) (*en banc*) (concluding that "[n]o procedural bar will apply to [§2255] claims for ineffective assistance of counsel which could have been brought on direct appeal but were brought in post-conviction

6

proceedings instead"). Here, the Court does not find Almaraz's ineffective assistance of counsel claims procedurally barred, and instead, will proceed to the merits of those claims *infra*.

      **B.**     ***Prosecutorial Misconduct Claims***:

      11.     Almaraz claims that the prosecution engaged in misconduct by "deliberating eliciting inadmissible expert testimony without an adequate foundation, by failing to disclose relevant evidence in its possession which would have impeached this expert testimony and by improperly vouching for the credibility of its pseudo-experts and its confidential informants." [Doc. No. 1, p. 19.] Some of these same allegations support Almaraz's similar ineffective assistance of counsel claims, e.g., trial's counsel's alleged ineffectiveness for failure to object to improper vouching and/or inadmissible expert testimony. None of the prosecutorial misconduct claims were raised on direct appeal by Almaraz's separate appellate counsel. *See* <u>Almaraz</u>, 306 F.3d at 1032-33. Because they were not raised on direct appeal, the government argues that these claims also are procedurally barred.

      12.     Again, § 2255 does not afford Almaraz a means to test the legality of matters not raised in his direct appeal. <u>Allen</u>, 16 F.3d at 378; <u>United States v. Cook</u>, 997 F.2d 1312, 1320 (10th Cir. 1993); <u>Daniels v. United States</u>, 26 F.3d 706, 711 (7th Cir. 1994) (a § 2255 motion "is neither a recapitulation of nor a substitute for a direct appeal"). Accordingly, the failure to raise an issue on direct appeal procedurally bars the issue from being raised in a habeas proceeding unless the petitioner can show cause excusing the procedural default and actual prejudice resulting from the alleged errors,

or that a fundamental miscarriage of justice will occur if the claim is not addressed.[4]  United States

v. Frady, 456 U.S. 152, 167-68, *reh'g denied,* 456 U.S. 1001 (1982).

13.     Clearly, here there is no showing of cause for the default.  In other words there is no

"showing that the factual or legal basis for a claim was not reasonably available to counsel, or that

some interference by officials made compliance impracticable. . . ."  Murray v. Carrier, 477 U.S. 478,

488 (1986).  Almaraz had a different attorney who investigated and filed his appeal, and the entire

trial transcript, record and pleadings would have been available to Almaraz.  Thus, Almaraz fails to

show that the factual or legal basis for any claim of prosecutorial misconduct was not reasonably

available to appellate counsel.  More than likely the claim is procedurally barred.  However, even on

the merits, the Court would recommend denying any claim for prosecutorial misconduct as explained

below.

14.     Prosecutorial misconduct warrants federal habeas relief only if, in view of the

proceedings as a whole, the conduct at issue "so infected the trial with unfairness as to make the

resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

> '[T]he miscarriage of justice' exception to the cause and prejudice test
> is narrow.  Only 'in an extraordinary case, where a constitutional
> violation has probably resulted in the conviction of one who is actually
> innocent, [may] a federal habeas court may grant the writ even in the

---

[4]Alternatively, a claim of actual innocence might serve to avoid a procedural bar.  *See* Schlup v. Delo, 513 U.S. 298, 326-27 (1995) (recognizing that a petitioner may assert actual innocence to avoid procedural bar so as to gain consideration of the merits of constitutional claims).  *See also* Bousley v. United States, 523 U.S. 614, 623 (1998) (a defendant who wishes to establish actual innocence to avoid procedural bar must show in light of all the evidence, that it was more likely than not that no reasonable juror would have convicted him).  Here, counsel for Mr. Almaraz admitted in opening statement that there was evidence that Mr. Almaraz sold cocaine.  Moreover, in Mr. Almaraz's § 2255 application, counsel states that "[a] fair review of the evidence demonstrates that Mr. Almaraz was simply a small time, street level drug dealer who supplemented his income as a co-owner of El Taco Mexicano in the City of Las Cruces by selling cocaine.  It was clear that Mr. Almaraz regularly employed one street dealer . . . ."  [Doc. No. 1, pp. 8, 9.]  thus, Defendant never argued factual innocence; his position is that the evidence was legally insufficient to convict him on some of the counts.

absence of a showing of cause for the procedural default.'  The fundamental miscarriage of justice exception is reserved solely for those with a 'colorable showing of factual innocence.'  In deciding whether this narrow exception applies in a particular case, the court is guided by the 'prototypical example, in which 'the State has convicted the wrong person of the crime.'  Application of this exception is limited to the 'extraordinary case.'

United States v. Kennedy, 29 F. Supp. 2d 662, 677 (D. Colo. 1998) (internal citations omitted), *cert. denied,* 225 F.3d 1187 (10th Cir. 2000).

15.    Here, Almaraz does not claim to be factually innocent.  Instead, he argues that the prosecutorial misconduct in his case reached the threshold of fundamental unfairness and/or that it was "so egregious as to create a reasonable probability that the outcome [of his trial] was changed."

16.    Specifically, Almaraz complains that the prosecutor elicited improper expert testimony from numerous law enforcement officers who opined that Mr. Almaraz was the leader of a large scale drug organization.  His citations to the trial transcript do not support Almaraz's position that the officers provided improper expert opinion.  Indeed, the cited portions of the transcript actually address the officers' or agents' factual testimony as to what quantities of drugs were provided and how quickly they were provided based on these officers' or agents' active involvement in the investigation of the alleged narcotic operations and controlled buys from the Defendants.  For example, Agent Sarkozy was asked the following questions:

Q.  What was the investigation's experience with respect to Ruben Almaraz's, Carlos Almaraz's, Jesus Orozco's, Janette Orozco's Carlos Lopez's, Antonio Lopez's and Jesse Chavez's ability to produce quantities of cocaine that were order.

A.  They always supplied the amount of cocaine we asked for.

. . .

Q.  What did that tell you about this group of individuals?

9

A.  It tells me that they're well organized.  It tells me that they have a consistent supply of cocaine that they want to distribute, that they have the amount of cash or credit with a supplier of cocaine to keep that flow of cocaine going . . .

(Tr. at 258-59.]

17.     Almaraz also cited to factual testimony given by Agent Cox, that was virtually identical to that given by Agent Sarkozy.  Agent Cox testified, based on his personal involvement in the investigation and controlled buys from the Defendants that Defendants were able to provide substantial quantities of cocaine and that they appeared well-organized.  [Tr. at 480.]  Almaraz cited Agent Cordova's testimony where he too, testified that in his experience with this investigation, the organization appeared to be  well organized and sophisticated.  [Tr. at 519.]  This was not improper expert testimony.  Moreover, it certainly does not demonstrate alleged misconduct "so egregious as to create a reasonable probability that the outcome [of his trial] was changed."

18.     Next, Almaraz contends that the prosecution engaged in *Brady* violations by suppression of favorable evidence to the accused.   "The essence of the *Brady* rule is that nondisclosure of material, exculpatory evidence violates a defendant's due process right to a fair trial."  Kennedy, 29 F. Supp.2d at 680 (internal citation omitted).  However, the government is not required to divulge "every possible shred of information" that might benefit a defendant and it has no obligation to disclose possible theories of defense to a defendant.  Id. (internal citations omitted.)

19.     To establish a *Brady* violation, the defendant bears the burden of establishing: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material.  United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir. 1994).  The problem with Almaraz's position is that he does not identify any specific *Brady* material that should have been

10

disclosed or that was suppressed. Instead, he speculates that his requests for all material favorable to the defense went unanswered. He fails, however, to identify what evidence was suppressed and what specific evidence should have been turned over. He fails to identify any evidence that was favorable to him and material to a finding of guilt. "The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir.), *cert. denied*, 513 U.S. 826 (1994); *see* United States v. DeLuna, 10 F.3d 1529, 1534-35 (10th Cir. 1993) (government need not disclose neutral, irrelevant, speculative or inculpatory evidence). The Court concludes that Almaraz has not satisfied his burden to demonstrate any *Brady* violations.

20. Almaraz's final argument with respect to alleged prosecutorial misconduct is that the prosecutor improperly vouched for the credibility of its informants and law enforcement officer witnesses. More specifically, Almaraz's states that the misconduct occurred when witnesses testified about wire taps and search warrants that the government obtained during its investigation, when officers testified that they concluded the alleged drug organization was organized, and when the prosecutor, in closing, "insisted that its witnesses had no motive to fabricate their testimony."

21. The Court again concludes that it was not improper for the agents to testify about the facts they uncovered or encountered during the investigation. Nor was it improper for the prosecution to present brief testimony regarding wire taps and search warrants. Indeed, Almaraz provides no legal support to show that eliciting such testimony constitutes prosecutorial misconduct. Moreover, in this case, the jury listened to multiple tapes of recorded telephone conversations between Defendants and informants, for which the government had to have obtained court authorization to record.

11

22.     Almaraz also asserts that a few of the prosecutor's closing remarks amounted to improper vouching on behalf of the government's witnesses.  The remarks at issue appear to be the following:

> Ladies and gentlemen, I want to put your minds at ease.  When I go home tonight, my paycheck is going to be just the same, regardless of the outcomes of this case. Despite the way the defense attorneys have tried to paint me, we've put a lot of effort in to this case, spent a lot of resources.  Agent Sarkozy's salary will be just the same tomorrow.  Agent Brad Cox's salary will be just the same tomorrow.  The outcome of this case does not change what I do for a living.

[Tr. at 709.]

23.     "[N]ot every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation."  Tillman v. Cook, 215 F.3d 1116, 1129 (10th Cir.) (internal citation omitted), *cert. denied*, 531 U.S. 1050 (2000).  To warrant habeas relief, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting [outcome] a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181, *reh'g denied*, 478 U.S. 1036 (1986).  In looking at the prosecutor's remarks at issue, the court considers the remark "in context, considering the strength of the State's case and determining whether the prosecutor's challenged remarks plausibly could have tipped the scales in favor of the prosecution."  Neill v. Gibson, 278 F.3d 1044, 1061 (10th Cir. 2001) (internal citations omitted), *cert. denied*, 537 U.S. 835 (2002).

24.     The comments made by the prosecutor certainly are not of the type to "inflame the passions or prejudices of the jury."  United States v. Cooper, 2004 WL 432236 at *13 (D. Kan. Feb. 10, 2004) (internal citation omitted).  They are not of the nature that might be "universally

condemned." The remarks do not directly vouch for the credibility of government agent witnesses, nor do they amount to excessive hyperbole. At closing, the prosecutor may indeed comment on the evidence or the reasonable inferences that may be legitimately drawn from the evidence. In this case, part of the defense strategy was to assign an improper motive to the government's witnesses and to the prosecution. It is not improper to challenge that strategy.

25.     Moreover, the government does not accuse the defendant of lying. *See* United States v. Kravchuk, 335 F.3d 1147, 1153-55 (10th Cir.) (prosecutor's closing statements about the defendant lying may have been improper but was not reversible error), *cert. denied*, 124 S. Ct. 279 (2003). "Although the Tenth circuit has characterized as 'unnecessary' and 'unwarranted' a closing argument in which a prosecutor called a defendant a 'liar,' it is not *per se* prosecutorial misconduct to refer to testimony as a lie. . . ." Id. at 1154 (internal citations omitted).

26.     The Court is cognizant that the Tenth Circuit condemns personalized vouching for the integrity of government witnesses. United States v. Beckman, 662 F.2d 661, 662 (10th Cir. 1981); United States v. Carleo, 576 F. 2d 846, 851-52 (10th Cir.), *cert. denied*, 439 U.S. 850 (1978). Here, the prosecutor neither accused a defendant of lying, nor did he express his personal belief concerning the veracity of the witnesses. He merely stated that the outcome of the case would not alter his or the agents' salaries. A jury instruction actually asked the jury to consider whether the outcome of the case might have a bearing on a particular witness's credibility. [Doc. No. 173, Jury Instruction No. 21.] The court finds that these particular closing comments are much closer to proper advocacy than improper vouching. *See* United States v. Luna, 13 Fed. Appx. 795, 800-01, 2001 WL 725981 at *4-5 (10th Cir. June 28, 2001) (comment that the jury should be proud of law enforcement's efforts to enforce the law was proper advocacy). Moreover, the jury was properly instructed that it

13

was the sole judge of each witness' credibility or believability. [Doc. No. 173, Jury Instruction No. 21.] Indeed, Jury Instruction No. 21 asks the jury to consider whether a witness might have a particular reason to not tell the truth, for example, did the witness have a relationship with the government or the defense. The jury was also instructed that closing argument by counsel was not to be considered as evidence and that the attorneys' statements were not evidence nor could they be considered as evidence by the jury. [Jury Instruction Nos. 1, 19.]

27.     The closing remarks at issue simply are not the type to have tipped the scales in favor of the prosecution or to have precluded jurors from fairly considering the evidence. After a careful reading of the seven-day trial transcript, it is clear that the government's evidence was largely undisputed and strong. As stated previously, Almaraz admitted guilt to some of the crimes. Here, the Court neither finds the remarks improper nor that they rendered Almaraz's trial fundamentally unfair. Moreover, the Court concludes that this matter is not the "extraordinary case" where the fundamental miscarriage of justice exception should apply to excuse Almaraz's failure to raise the prosecutorial misconduct claims on appeal.

28.     Thus, the Court recommends that the prosecutorial misconduct claims be dismissed because they are procedurally barred. Alternatively, the Court recommends that the claims be denied and dismissed on the merits for the reasons stated above.

## II.     INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A.     *Legal Standard:*

29.     "The benchmark for judging any claim of ineffectiveness must be whether the counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686,

14

104 S. Ct. 2052 (1984)  To obtain relief on an ineffective assistance of counsel claim, a defendant must satisfy the requirements set out in <u>Strickland</u>.  First, the movant "must show that counsel's representation fell below an objective standard of reasonableness.  <u>Id.</u> at 688.  In other words, trial counsel's performance was neither reasonable under prevailing professional norms nor sound trial strategy.  Second, the movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Id.</u> at 694.  A probability is reasonable if it is sufficient to undermine confidence in the outcome.  <u>Id.</u>  The Court may address the performance and prejudice components in any order and need not address both if it concludes that the defendant failed to satisfy demonstrating one of the two prongs.

30.  In <u>Strickland</u>, the United States Supreme Court emphasized that judicial scrutiny of counsel's performance must be highly deferential.  An adverse result is not evidence of ineffective assistance, and a court should not second-guess counsel's representation after an adverse verdict or sentence.  An attorney's performance should be evaluated from counsel's perspective at the pertinent time, giving due regard to counsel's trial tactics and strategy, and thereby eliminating any distorting effects of 20/20 hindsight.  A court must indulge a strong presumption that counsel's conduct was reasonable and could have been considered sound trial strategy.  <u>Id.</u> at 689.  The defendant has the burden of proof to overcome that presumption.  <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984).  "For counsel's [decision] to rise to the level of constitutional ineffectiveness, the decision . . .must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'"  <u>Hatch v. State of Okl.</u>, 58 F.3d 1447, 1459 (10th Cir. 1995) (internal citation omitted), *cert. denied*, 517 U.S. 1235 (1996).

15

B.    *Failure to Investigate and Present Almaraz's Central Defense; Failure to Request Jury Instructions:*

31.    Almaraz argues that trial counsel was constitutionally ineffective because he did not present Almaraz's central defense to the continuing criminal enterprise charge that he was not the leader or organizer of the enterprise.  Almaraz asserts that trial counsel did not investigate the availability of this defense and did not request a jury instruction on this defense.

32.    The continuing criminal enterprise statute, 21 U.S.C. § 848 provides:

[A] person is engaged in a continuing criminal enterprise if –

> (1) he violates any provision of [the federal drug laws[ the punishment for which is a felony, and
> (2) such violation is a part of a continuing series of violations of [the federal drug laws] –
>
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
> (B) from which such person obtains substantial income or resources.[5]

Almaraz, 306 F.3d at 1034-35.  [Doc. No. 173, Jury Instruction No. 8.]

33.    Almaraz asserts that trial counsel was ineffective by not presenting evidence and the defense that he did not organize, supervise or manage five or more persons.  Almaraz notes that in opening argument, his attorney claimed that the evidence would show Almaraz was not guilty of engaging in a continuing criminal enterprise due a lack of evidence that he controlled five or more people.  However, Almaraz argues his attorney did not follow up and present any such evidence.

---

[5]The jury was instructed that "substantial income or resources" meant income in money or property that was significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount.  "Income and resources" meant receipts of money or property not net profits.  The government need not show that the defendant made any profit from the enterprise's operation.  [Doc. No. 173, Jury Instruction No. 8

Instead, he presented no live testimony and admitted into evidence only a few photographs.  More specifically, Almaraz contends that his attorney committed error in failing to present evidence that Almaraz was only engaged in the ongoing sales of cocaine with one criminal associate at a time or that he never supervised five persons at the same time.

34.     First, it is not clear what Almaraz means when he challenges his attorney's failure to investigate the defense.  He has made no showing as to the existence of favorable evidence or what an investigation would have revealed that might have strengthened his defense or affected the jury's determination.  *See* Gordy v. Hargett, 37 Fed. Appx. 437, 439, 2002 WL 1227443 at *2 (10th Cir. June 6, 2002) (discussing failure to investigate claim in context of § 2254 habeas petition); *see also* United States v. Tucker, 2004 WL 813681 at *6 (D. Kan. Feb. 13, 2004) (citing case for proposition that ineffective assistance claim would be rejected if defendant failed to demonstrate prejudice resulting from an attorney's failure to investigate).

35.     Second, it is clear from a reading of the trial transcript that his attorney did present Almaraz's defense that he was not the organizer and/or did not manage five or more persons during the alleged enterprise.  During opening statement, attorney Abraham argued:

> The evidence will show that with regards to the other offenses, there is no evidence that Ruben Almaraz was involved in those cases.  There will be evidence that there came a time when Ruben Almaraz was charged with a continuing criminal enterprise, that he somehow was the leader of some organization that involved some five or more individuals.  The evidence in this case will not show that.

. . .

> The evidence in this case will show that every time there was a transaction that Ruben was ever involved in, or one of these other individuals was ever involved in, it was the undercover individuals that were calling them to deliver this cocaine.

17

. . .

And so whenever they say, the government contends that there is this organization, there is no organization. Candidly, Ruben Almaraz violated the law. Should he be punished for it? Sure, no doubt about that. Should he be found guilty of a continuing criminal enterprise? The evidence in this case is not going to show that he is a person, number one, that made substantial profits from this transaction. And that's what the government must show. There's no evidence of that.

The evidence must show that he was in control, or at least he was a manager, organizer or leader of five or more individuals. The evidence in this case is not going to show that. The evidence, ladies and gentlemen, is going to show that Ruben Almaraz here in Las Cruces got involved in selling cocaine. He did that. The evidence in this case is going to show that he was not, that he was not the leader, organizer or anything like that with regards to continuing criminal enterprise.

[Trial Tr. 98-100.]

36.     Abraham consistently attempted to challenge and undermine the government's attempt to paint a picture that Almaraz was the leader of a criminal enterprise. At the beginning of the third day of the trial, Abraham objected to the prosecution's reference to the "Almaraz organization" and argued that it was a conclusion that was properly before the jury. The Court sustained the objection. [Trial Tr. at 197.]  During the prosecution's direct examination of Agent Sarkozy, Abraham continued to present the defense that Almaraz was more akin to a lone actor than an organizer of an enterprise. For example, the prosecutor asked Agent Sarkozy if he developed a theory that one of the co-defendants was working for someone, to which Sarkozy responded in the affirmative. However, at this point Abraham objected as to the witness' speculation on this theory and the objection was sustained.  [Trial Tr. at 186.]  Thus, the trial record disputes Almaraz's claims.

18

37.     During cross-examination of Agent Sarkozy, Abraham emphasized through his questions that Almaraz never initiated or set up any of the sales that made up the controlled buys. [Trial Tr. at 259-60.]   Abraham also drew attention to the fact that during a majority of the undercover operation, from May 21, 1998 to September 28, 1998, Almaraz purportedly was not even in the City of Las Cruces, inferring that it might be difficult to organize such an enterprise if he was not present.   [Trial Tr. at 285-86.]   On cross-examination, Abraham brought out the fact that the agents did not have Almaraz under surveillance and did not get any court authorization to record Almaraz's telephonic beeper or his home telephone number.   [Trial Tr. at 287, 289, 290.]   When agents executed the search warrant on Almaraz's home, they found no controlled substances and no large amounts of money.   [Tr. at 291.]

38.     During his cross-examination of Agent Cox, Abraham continued to emphasize a lack of involvement by Almaraz in some of the controlled buys, either by showing that Almaraz was never present during the actual buys or that the information implicating Almaraz's involvement was uncorroborated by anyone who did not have a personal stake in the outcome of this matter.   [Trial Tr. at 446-47, 449, 452, 454.]   Agent Cox admitted that Almaraz never called him, even though Cox had asked that Almaraz call him and that Almaraz did not meet Cox with respect to a planned buy. [Trial Tr. at 454-55.]

39.     During cross-examination of Agent Cordova, Abraham attempted to show that Almaraz was unaware of a prior drug deal conducted between one of his supposed employees and the agent.   [Trial Tr. at 562-63.]   Thus, he sought to make the inference that if Almaraz were the leader of the organization, certainly he would have known what was going on with respect to drug sales within that organization.   On re-direct of Agent Cordova, the prosecutor asked the agent what

19

he did to further the investigation.  Agent Cordova stated that "already knowing who the leader was, I went directly to the leader.  That only opened the door for me to walk into the leader, and having a good excuse that ----."  [Trial Tr. at 579.]  Again, Abraham appropriately objected to the non-responsive answer and speculation on the agent's part.  The objection was sustained.

40.     During Almaraz's motion for judgment of acquittal, Abraham continued to emphasize that the government had not proven each of the required elements for the continuing criminal enterprise charge, namely that the government did not establish that Almaraz had obtained a substantial income, had acted in concert with five or more persons, and/or had occupied a position of organizer, supervisor or manager.  [Trial Tr. at 596.]

41.     During closing, Abraham again argued that Almaraz could not have been the leader of an organization when he did not even know about a four-kilo transaction that was taking place.  [Trial Tr. at 671.]  Abraham emphasized that the government did not play one taped telephone call between Almaraz and the co-defendant who made a number of the sales at issue.  [Trial Tr. at 672.]  Abraham went through the elements of the crime, one by one, arguing that there was no evidence that Almaraz gained any type of substantial income or resources from the operation.[6]  He did not have a fancy house and there was no money found in his home.  Abraham then argued that there was no evidence to show that Almaraz directed five people in the organization, specifically Janette Orozco, and several other co-defendants.  [Trial Tr. at 675.]  The record demonstrates that Abraham presented a well-reasoned defense and advocated strongly on Almaraz's behalf.

---

[6]However, it was undisputed that on one occasion, Almaraz sold one kilo of cocaine to undercover agents for $13,300.  [Ex. 58A, p. 26-29.]

20

42.     This case must be viewed in the context that there was some incredibly damaging testimony presented to implicate Almaraz as the leader of the organization.  First, Abraham noted in his affidavit statement that it was undisputed that Almaraz was involved in two sales of cocaine.  Both sales were recorded on audiotape, and it was unquestionable that Almaraz was involved.  Abraham stated that he made the strategic choice to concede these two counts hoping to gain credibility with the jury.  [Sib Abraham Affidavit, attached to Government's response.]  By conceding just the two sales, Abraham believed he would have a stronger argument that Almaraz was a small-time dealer rather than a leader of a large-scale drug operation.  [Id.]  This decision was clearly tactical.

43.     In addition, the government presented strong evidence through tape recordings that implicated Ruben Almaraz as the person in charge.  For example, Ruben was recorded as having told a cooperating source that Chuy (Orozco, a co-defendant) was "all right" and that "he's the one that does these things for me" (referring to drug transactions).  (Govt. Ex. 21A, pp. 15-16.]  Almaraz then set the price of sale to the cooperating source as lower than what that person said he could buy it from elsewhere.  [Id.]  Later Almaraz told the cooperating source to contact him through Chuy's number.  "But uhm . . . the thing .. thing you get off of him is my shit."  [Id. at p. 19.]  In yet another taped conversation, Chuy told the cooperating source that "Ruben told [him] that he would sell it for 36 each.  [Govt. Ex. 24A, p. 8.]  Later in the conversation, Chuy told Agent Cox (who was undercover) that Ruben told him he would sell at 37 instead of 36.  [Id., p. 40.]  Chuy also told the confidential source to just go ask for Ruben with respect to some of the requests for drugs.  [Id., p. 44.]

44.     There was another taped conversation on September 28, 1998, during which Officer Cordova (acting undercover) told Carlos Almaraz that he had been trying to contact Congo and Flaco

to purchase cocaine but they had not returned the page.  Carlos then used Cordova's (undercover) cell phone to place a telephone call that was traced to Ruben Almaraz's residence.  Carlos was recorded as having told Ruben Almaraz that "the lawyer is here and is waiting to make a deal" [Govt's Ex. 58.]   Later Ruben Almaraz met with Carlos Almaraz, Antonio Lopez (another co-defendant) and two undercover agents where the agents purchased one kilogram of cocaine for $13,300.  After that meeting, Almaraz gave Agent Cordova a pager number with which to contact him for future purchases.  [Govt's Ex. 58.]

45.     Based on a careful reading of the trial transcript, it simply cannot be said that Abraham failed to investigate and present the defense that Almaraz was not the leader or organizer of the enterprise.  Abraham consistently made this point in opening statement, objections, cross-examination of key witnesses, legal arguments and closing.  It is true that Abraham did not present the testimony of any witnesses during his case in chief, but here, Almaraz does not specify any witnesses that should have or would have presented favorable and/or material testimony as to this issue, nor does he supply affidavit testimony by these supposed witnesses.  Moreover, there may have been sound strategic reasons why Abraham did not call certain witnesses.  For example, there may have serious credibility issues with calling some of the confidential informants involved here, or they might have provided more damaging than helpful testimony.  Almaraz's bare assertion that his counsel was ineffective for failing to present unspecified evidence is insufficient to overcome the "strong presumption" that counsel provided constitutionally effective assistance.  Strickland, 466 U.S. at 689;  *see also* United States v. Snyder, 787 F.2d 1429, 1432 (10th Cir.) ("Counsel's selection of questions is a matter of 'strategic choice,' as to which he has broad latitude."), *cert. denied*, 479 U.S. 836 (1986).  Nor did Almaraz come forward with sufficient allegations regarding prejudice to overcome the "strong

presumption of reliability" that attaches to his criminal proceedings.  <u>Strickland</u>, 466 U.S. at 696.

The Court cannot conclude that trial counsel's failure to call (unidentified) witnesses was the product

of "neglectful" or otherwise erroneous representation.  <u>Sallahdin v. Gibson</u>, 275 F.3d 1211, 1240

(10th Cir. 2002).  To the contrary, the record supports a finding of effective representation.

      46.    Almaraz also argues that trial counsel erred in failing to request a jury instruction

requiring unanimous agreement on each of the five individuals whom Almaraz allegedly managed or

organized.  In addition, he claims that counsel was deficient in failing to request an appropriate

instruction to advise the jury that successive supervisees who merely replaced previous supervisees

could not be aggregated to establish the existence of a continuing criminal enterprise.

      47.    The Court agrees with the government that Almaraz raised at least part of this exact

argument in his appeal.  "Mr Almaraz argues a continuing criminal enterprise conviction 'requires

proof that the defendant supervised five or more persons while committing the violations on which

the jury unanimously agrees."  <u>Almaraz</u>, 306 F.3d at 1034.  The Tenth Circuit observed that the trial

court had instructed the jury that it had to find the following:

> Almaraz "undertook *such violations* [i.e., the 'series of violations']
> in concert with five or more person with respect to whom the
> defendant occupied a position of organizer, supervisor or manager"
> (emphasis added), to return a guilty verdict.  The instruction did not
> limit the violations to those for which it returned a conviction.
> Therefore, the instruction as given does not resolve this part of the
> issue presented by Mr. Almaraz."  (The court also noted that Abraham
> had submitted a jury instruction that would have limited the
> "continuing series of violations" to those violations as charged in
> certain Counts, but this jury instruction was not used).

<u>Id.</u> at 1038, n. 7.  On appeal, it was Almaraz's position that the jury could not have found he

organized, etc. five or more persons during the course of the three violations for which the jury

actually found him guilty, because those violations did not implicate five or more people.

23

48.     The Tenth Circuit rejected this argument.  While the jury is required to unanimously determine which violations make up the series, there is no unanimity requirement in respect to the identify of the five or more persons.  "We presume Congress would have used the term 'conviction' if it wished to limit the acts that make up the 'continuing series of violations' to acts for which the jury returned a guilty verdict."  Id. at 1039.  Thus, the Court held that the jury is not limited to consider only those acts for which it returned a guilty verdict in deciding which acts made up the "continuing series of violations' undertaken by five or more persons.  Id.

49.     The Tenth Circuit proceeded to analyze Almaraz's argument that there was insufficient evidence to prove he organized, supervised, or managed five or more persons at any time, and rejected this argument as well.  Id. at 1040.  Under the statute, an organizer, supervisor, or manager are terms given their nontechnical, every day meaning.  The supervisory relationships need not have existed at the same time or with each other.  A defendant cannot insulate himself from liability by delegating authority.  Nor does the organizer need to be the dominant or only organizer.  Id.  The court carefully considered whether the evidence was sufficient to show that Almaraz was the leader or organizer of five persons, and concluded that it was sufficient for a reasonably jury to find Almaraz supervised five persons.  Id. at 1042-43.

50.     Based on the Tenth Circuit's holding, Almaraz's jury instruction argument would be futile.  It is not ineffective assistance of counsel to fail to make a futile argument.  United States v. Cook, 45 F.3d 388, 392 (10th Cir. 1995).  See also United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999) (it is not ineffective assistance to fail to pursue meritless theories).

51.     Almaraz also argues that the continuing criminal enterprise conviction was legally insufficient because the individuals he supervised were only replacements of other dealers who had

24

left.  Thus, his position is that successive or replacement supervisees cannot be counted separately as people under a defendant's supervision or control for purposes of proving the element that a defendant supervised five or more persons.  In reliance on his position, Almaraz cites United States v. Gibbs, 61 F.3d 536, 538 (7th Cir.), *cert. denied*, 516 U.S. 1000 (1995).

52.     The Court finds Gibbs distinguishable, and in any event, that court concluded that defendant Gibbs had supervised or organized five or more persons notwithstanding the argument that he had not.  Id. at 538-39.  Gibbs argued that even if he managed or supervised five or more persons over the course of the conspiracy, the evidence was insufficient because the government's case focused on his operation of a courier service.  He asserted that "because the various couriers traveled to Arizona at different times, they constituted only a series of replacements as opposed to separate cogs in a larger, ongoing courier network."  Id. at 538.  Accordingly, Gibbs argued that the sum of the various couriers should be considered as only a single person, and essentially that the evidence showed he was only a small time dope dealer who worked with a single mule.  The court disagreed, concluding that Gibbs' organization was much larger than that, and that it involved at least five individuals at nearly all times, including family members.  Id.  The court reiterated that it was not necessary for the defendant to have supervised at least five individuals simultaneously.  Thus, the court concluded that the government's evidence was sufficient to sustain the CCE conviction.  Id. at 539.

53.     This case is distinguishable from Gibbs in that there was not a courier service at issue here.  In addition, the government cites a number of cases standing for the proposition that there is no requirement that the five individuals act in concert or contemporaneously, nor that the jury conclude unanimously as to the identities of the five persons.  [Doc. No. 7, at pp. 30-32, 04cv230.]

The Court agrees with the weight of this authority. Moreover, in Almaraz's appeal, the Tenth Circuit specifically found that there was substantial evidence to show Almaraz supervised at least five persons. First, the Court noted that Almaraz conceded such a relationship with two other people: Jesus Orozco and Antonio Lopez. However, he disputed that there was evidence sufficient to show that he supervised Janette Orozco, Carlos Lopez, Jesse Chavez or Carlos Almaraz. The Tenth Circuit undertook a thorough review of the evidence and concluded otherwise. Specifically, the Court determined that there was sufficient evidence for a reasonable jury to find that Carlos Lopez, Jesse Chavez and Carlos Almaraz were members of the Almaraz organization that was supervised or managed by Almaraz. Almaraz, 306 F.3d at 1041-43.

54.     Thus, again, it is not ineffective assistance of counsel to pursue a meritless theory. Accordingly, this Court recommends that Almaraz's ineffective assistance of counsel claims with respect to failure to present his central defense, to investigate the defense and to submit related jury be denied and dismissed.

### C.     *Failure to Object to Inadmissible Expert Testimony:*

55.     Almaraz contends that Agent Sarkozy, Agent Cox and Agent Cordova all were allowed to offer inadmissible expert opinions "on the characteristics of organized, well-supplied drug distribution rings" and on the ultimate issues in the case, e.g., that the Almaraz organization was a sophisticated drug enterprise that could supply large quantities of narcotics. Almaraz cites to a number of pages of testimony by these three agents that he contends were objectionable, and that even if his attorney did successfully object to some of the testimony, he failed to move to strike the inadmissible responses. [Doc. No. 1, p. 10, n. 3.]

56.     These agents were never tendered as expert witnesses in the trial, nor was the Court asked to make a determination that any of the agents were qualified to render expert opinions. Indeed, it does not appear that any of the five attorneys representing the five defendants raised specific objections that the agents were offering improper expert testimony or that they should have been qualified as experts.[7]

57.     In examining the citations referred to by Almaraz's counsel, the Court again concludes that the testimony given by the agents was more in line with factual determinations made during their actual investigation of and undercover buys with the Defendants and based on their personal knowledge and observations.  Moreover, the pertinent version of Federal Rule of Evidence 701 in 1999, provided that if a witness was not testifying as an expert, he or she could give testimony in the form of opinions or inferences limited to those that were "rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  FED. R. EVID. 701 (1999 version).[8]  Thus, under this version of FED. R. EVID. 701, a lay witness could give an opinion derived from an inference the witness drew if the inference was predicated on conduct the witness observed personally and was an inference that could be considered helpful to the jury in the determination of a disputed fact.  An opinion or inference rationally based on the witness' perception does not invade the realm of expert testimony.

------

[7]Counsel may have elected not to require the agents to be qualified as experts for strategic reasons.  Once qualified as experts, if they had been able to satisfy the requirements, their expert testimony might have given yet more credence to their factual testimony that was based on their personal observations and knowledge of the undercover investigation.

[8]The 2000 Amendments to FED. R. EVID. 701 attempted to eliminate the risk that the reliability requirements set forth in FED. R. EVID. 702 would be evaded by simply proffering an expert in the guise of lay witness clothing.  Thus, under the current version of FED. R. EVID. 702, if the witness was providing testimony based on scientific, technical or other specialized knowledge within the scope of Rule 702, that witness would have to qualify under Rule 702.

58.     The Court concludes here that virtually all of the testimony objected to by Abraham amounts to permissible lay testimony.  For example, on page 115 of the trial transcript, Agent Sarkozy summarized that the investigation he undertook concerned  drug trafficking activities of the Almaraz organization that was distributing cocaine.  This testimony was more akin to factual testimony based on Sarkozy's personal observations and actual investigation into the activities of the Almaraz brothers and co-defendants.  Almaraz also objected to the time line of drug transactions prepared by Sarkozy and discussed at trial, and yet the time line merely documented the controlled buys that were conducted and of which Sarkozy had personal knowledge.  [Trial Tr. at 121.]  Almaraz objected to Sarkozy's statement that defendant Orozco, at one point, appeared conscious of being surveilled by law enforcement officers.  [Trial Tr. at 143.]  Yet, this testimony arose from these statements to the cooperating source by Orozco:  "The thing is that I don't want to do anything outside, just in case they're taking pictures or something, know what I mean?"  [Id.]  It is not improper opinion testimony for Sarkozy to deduce from Orozco's statements that Orozco was concerned about being surveilled.  Similarly, Almaraz objected to Sarkozy's testimony that he observed Mrs. Orozco appearing nervous and furtive during a surveilled situation and his impression that she seemed to be conducting countersurveillance.  These observations are nothing more than Sarkozy's direct observations of the situation rather than improper expert testimony.  [Trial Tr. at 153.]  Almaraz also objected to Sarkozy's interpretation of certain code words that were used by the defendants as being street slang for cocaine.[9]  [Trial Tr. at 168.]  Again, this type of information

---

[9]This type of testimony about code words being used to refer to certain types of drugs or drug quantities might be testimony based on an agent's specialized knowledge that is governed by Rule 702's requirements.  Yet, the Court also might have considered the testimony in this particular case to have been derived based on the agent's particularized knowledge he gained by virtue of his direct investigation of and participation in this undercover operation.  In any event, the Court does not find this type of testimony amounted to surprise expert testimony in view of the many recordings played to the jury which clearly implicated drug transactions were

28

appeared to derive from the agent's direct participation in the surveillance and investigation of the undercover buys rather than consisting of improper opinion testimony.

59.    Another example of Almaraz's objections to testimony provided by Sarkozy is Sarkozy's testimony that in his experience, illegal criminal enterprises hide their assets so as not to subject their assets to asset forfeiture as a result of their illegal drug activities.  [Trial Tr. at 188.] Sarkozy gave this general opinion testimony based on his prior experience in drug trafficking investigations.  Then Sarkozy testified that with Orozco they were attempting to tax his ability to supply cocaine to find out the limits of what he could supply.  [Trial Tr. at 207.]  In Sarkozy's experience, by doing this, the opportunity may arise for the initial supplier to identify the larger supplier.  [Tr. at 207.]  However, in this case, Sarkozy testified they were unable to tax Orozco's ability to supply cocaine.  Notwithstanding their inability to do so, they eventually recorded Ruben Almaraz as stating that Orozco (known as "Chuy") was "all right"  "He does these things for me." [Tr. at 208.]  Almaraz then stated that the thing that you get off of [Chuy] is my shit.  Rather than impermissible opinion testimony, this was a factual deduction by Sarkozy that followed from his direct participation in this investigation.[10]

60.    Almaraz objects to some of Agent Cox's testimony that as to one purchase of cocaine, it was packaged in ounce baggies.  [Trial Tr. at 477.]  Agent Cox testified that the large chunks or large rocks in the baggies indicated to him that the cocaine was broken off a kilogram or brick of

_____

occurring between Defendants and undercover agents.  Nor does Almaraz argue that any of the code words described by the agents or references to amounts of cocaine referred to something other than controlled substances or quantities of drugs.

[10]The Court does not analyze each and every citation referred to by Almaraz, and yet has examined each reference.  The Court concludes that all of these references, rather than consisting of improper expert testimony, derived from factual determinations made by the agents during their active participation in the undercover operation and investigation.

cocaine, or that it came straight from the kilo rather than having been cut. While this might consist of opinion testimony based on Cox's prior experience in handling controlled buys of cocaine, counsel's failure to object does not appear to satisfy the showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Based on the undisputed evidence as to the quantities and types of cocaine being supplied to the undercover agents and informants, the Court cannot conclude that there is a reasonably probability that this testimony would have undermined confidence in the outcome of the proceeding.

61.     Cox was also asked based on his experience with this investigation, whether it appeared to him that the Defendants could provide substantial quantities of cocaine and whether they appeared well-organized, to which Cox responded affirmatively. [Trial Tr. at 480.] Again, this testimony is based on Cox's direct observations and involvement in the investigation rather than on scientific or specialized knowledge. The Court does not further discuss Agent Cordova's testimony, which is similar to that provided by Cox and already has been discussed in terms of the prosecutorial misconduct claim *supra.*

62.     In addition, when it came to eliciting testimony from agents that might have been construed as improper testimony, Abraham did make a number of objections that were sustained. [*See, e.g.,* Trial Tr. at 186, 197, 516, 579.] The Court concludes that for the most part, trial counsel's performance was not unreasonable under prevailing professional norms. This is mostly true because virtually all of the testimony given by the agents at issue was not improper opinion testimony and therefore, did not require an objection. Moreover, when there was questionable testimony, Abraham objected. Second, and more importantly, even if Abraham erred at times in failing to object

30

or failing to move to strike certain testimony, that testimony was not highly prejudicial because it was unrebutted by the many recorded conversations played to the jury of the controlled buys made between Almaraz, co-defendants and government players, along with Almaraz's recorded concessions that the drugs were his and that he set the price.

63.    "Effective assistance does not mean victorious or flawless counsel." Brady v. United States, 433 F.2d 924, 925 (10th Cir. 1970).   This simply is not the case where Abraham's representation made the trial "a mockery, sham or farce, or resulted in the deprivation of constitutional rights." Lorraine v. United States, 444 F.2d 1, 2 (10th Cir. 1971).   The Court does not conclude that any alleged errors made by Abraham's failure to object or failure to move to strike certain testimony denied Almaraz a fundamentally fair trial.   Abraham had a full opportunity to cross-examine the agents to challenge the basis of any testimony they gave, and he did so.   Further, he could have called his own experts to rebut any testimony he believed was improper expert testimony. In sum, the Court does not find that Abraham was constitutionally ineffective by failing to object to the agents' testimony at issue and will recommend that this claim be dismissed.

### D.    *Failure to Object to Improper Vouching of its Witnesses by the Prosecution:*

64.    Almaraz contends that Abraham was constitutionally ineffective for failure to object to the government's improper vouching for its witnesses.   The Court has already thoroughly considered and analyzed this claim with respect to its discussion of the prosecutorial misconduct claim *supra*, and does not repeat that entire discussion again here.   However, the Court again finds no basis for Almaraz's argument that testimony by government agents as to a court's authorization for wiretap authorizations or search warrants suggests some sort of impropriety.   The fact that agents acted in accordance with the law by obtaining proper warrants or authorizations for its investigative

31

actions and that this testimony arose during the trial does not amount to "improper vouching" on behalf of those witnesses. Similarly, Almaraz identifies no other instances of improper vouching by the prosecution to which his attorney should have made objections. Thus, it was not ineffective assistance of counsel to fail to object to the prosecution's alleged improper vouching. The Court recommends that this claim be denied and dismissed.

### E. Failure to Object to Inadmissible Hearsay Testimony:

65.     Almaraz argues that the prosecution was permitted to introduce damaging hearsay testimony that implicated him in a continuing criminal enterprise without any objection by counsel, and further that this failure to object violated Almaraz's right to confront and cross-examine the witnesses for whom hearsay testimony was introduced.

66.     Abraham made a number of hearsay objections during the trial. He objected to Sarkozy repeating what confidential informant Paul Ontiveros told him with respect to how Ontiveros got involved in the investigation. [Trial Tr. at 116.] The Court essentially sustained the objection. Yet, the government then explained that Ontiveros' testimony regarding Ontiveros' own criminal activity was not coming in for the truth of the matter asserted, and it was at that time, that Sarkozy was permitted to explain why Ontiveros was willing to cooperate with this investigation. [Trial Tr. at 116-118.] It is true that the Court later overruled Abraham's hearsay objection as to what information Ontiveros promised he could supply to the government in its investigation, but again this testimony came in not for the matter asserted, but rather to explain why the government used Ontiveros in its investigation. [Tr. at 119-20.]

67.     An out-of-court statement which is not offered for the truth of the matter asserted is not hearsay, and is, therefore admissible. FED. R. EVID. 801(c). In addition, the Tenth Circuit has

held that "out of court statements are not hearsay when offered for the *limited* purpose of explaining why a Government investigation was undertaken." United States v. Cass, 127 F.3d 1218, 1222 (10th Cir. 1997) (internal citation omitted) (emphasis added), *cert. denied*, 522 U.S. 1138 (1998).

68.     The same kind of testimony came in with respect to another informant who was willing to cooperate in an effort to reduce charges against him.  The agent testified that it used James Troy Sloan in its undercover operation because of his information regarding methamphetamine users in Artesia and the Almaraz drug organization in Las Cruces.  Although there was no objection this time from Abraham, clearly the Court had already decided this information was not coming in for the truth of the matter asserted, but instead to explain why the government was using this particular informant. [Trial Tr. at 162.]

69.     Abraham did object to additional testimony by Sarkozy regarding Sloan's purported prior friendship with Almaraz, and the hearsay objection was sustained.  [Trial Tr. at 205-06.] Abraham again successfully objected to testimony by Sarkozy as to what another agent said.  The Court again essentially sustained the objection and admonished the prosecution not to repeat testimony from another witness.  [Trial Tr. at 248-49.]

70.     Almaraz argues that Agent Cox was allowed to provide hearsay testimony from Sloan as to a meeting Sloan had with Almaraz on May 21, 1998 that was not tape recorded.  He cites to pages 432 and 448 of the trial transcript.  Page 432 merely states that Sloan met with Almaraz, and talked to him about setting up another meeting.  Nothing more was said about this alleged conversation or meeting.  Sloan, however, had been instructed by Cox to attempt to purchase a minimum of a half-pound of cocaine.  [Trial Tr. at 432.]  Cox's testimony on page 432 does not appear to be inadmissible hearsay that was coming in for the truth of the matter asserted.  At page

33

448 of the transcript, Abraham was cross-examining Cox regarding the meeting that Sloan had with

Almaraz.   Abraham's cross-examination appeared to emphasize Almaraz's minimal role and also the

fact that the government did not have any corroboration that Sloan met with Almaraz since there was

no tape recording.   Abraham was emphasizing that Sloan, an informant with a criminal record who

was cooperating to reduce charges against himself, was hardly a fountain of credibility.  [Tr. at 447.]

Again, this was a strategic decision by Abraham, rather than an example of constitutionally ineffective

assistance of counsel.   Abraham closed his cross-examination of Cox by emphasizing that even though

Cox attempted to set up a meeting with Almaraz or to get Almaraz to call him, this never occurred.

[Trial Tr. at 454-55.]

71.    The Court disagrees that Abraham failed to object to improper hearsay testimony.

Indeed, he made a number of appropriate and timely objections as to hearsay that were sustained.

Here, Almaraz has not identified any instances of Abraham's failure to object that "fell below an

objective standard of reasonableness."   Even if Abraham did commit error, Almaraz fails to show

"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."   This is especially true in view of the undisputed tape-

recorded evidence that was admitted that implicated Almaraz in the sales of cocaine and in his role

of leader or organizer of the enterprise and the physical evidence as well.  The Court simply does not

conclude that the exclusion of the cited statements would have changed the verdict from guilty to not

guilty.

72.    Therefore, the Court recommends that this ineffective assistance of counsel claim, like

the others, be denied and that the claim be dismissed.

**Recommended Disposition**

For all of the above-stated reasons, the Court recommends that Almaraz's § 2255 petition be denied [doc. no. 1], that the motion for evidentiary hearing [doc. no. 8] be denied, and that the case be dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge